UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| DONNA SAMUELS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Case No. 12-cv-301-JMH |
| v. | ) | |
| | ) | |
| CORRECTIONAL MEDICAL | ) | |
| SERVICES, INC. d/b/a Corizon, | ) | **MEMORANDUM OPINION & ORDER** |
| Inc., | ) | |
| | ) | |
| Defendant. | | |

\*\*\*

This matter is before the Court upon the Motion for
Summary Judgment [DE 19] of Defendant Corizon, LLC ("Corizon"),
formerly known as Corizon, Inc., and incorrectly identified as
Correctional Medical Services, Inc., d/b/a Corizon, Inc.,
Plaintiff has filed a Response [DE 26] stating her objections,
and Defendant has filed a Reply [DE 29] in further support of
its Motion. Having considered the Motion and being adequately
advised, the Court concludes that summary judgment in favor of
Defendant is appropriate in this matter as set forth in this
Memorandum Opinion and Order.

**I.**

Defendant Corizon provides medical care services to inmates
at the Lexington-Fayette County Detention Center ("LFCDC") in
Lexington, Kentucky. Corizon provides two medical records

clerks at the LFCDC. One of those clerks serves as a part-time employee. The other is a full-time employee. Both are supervised by the Health Services Administrator ("HSA"). Mental health services and other treatment are provided to inmates at LFCDC by Bluegrass Mental Health – Comprehensive Care ("Comp Care"). Corizon's medical records division maintains and stores medical records for all inmates at the LFCDC, and Corizon is the custodian of these records. Employees from both Corizon and Comp Care must work cooperatively with one another to ensure that all have access to accurate medical records.

Plaintiff, who is African-American, began working for Corizon as a medical records clerk on April 4, 2005. She voluntarily resigned on May 9, 2007, but was reemployed on November 19, 2007, as a "PRN" or "as needed," medical records clerk. Shortly thereafter, Plaintiff became a part-time medical records clerk.

Plaintiff attended Corizon's orientation program, during which she was to become familiar with Corizon's personnel policies and procedures, which are set out in a personnel manual titled Corizon Employee Success Guide (the "Guide"). The Guide includes, in pertinent part, Corizon's Equal Employment Opportunity Policy, Anti-Discrimination Policy, and Corrective Action Policies. The Corrective Action Policy allows, in pertinent part, employees to be informed regarding problems and

correct performance or conduct deficiencies before more serious action is taken. Each employee receives a copy of the Guide at the time of hire and an additional copy each time the Guide is revised. Plaintiff acknowledged receipt of the Guide upon hire and the latest version of the Guide on March 30, 2012.

Upon her rehire, Plaintiff received a copy of her medical records clerk job description, which she acknowledged that she read and fully understood. The medical records job description provides that a medical records clerk's essential functions include retrieving medical charts for all healthcare staff or clinics as requested; filing daily all currently used medical records; assuring that charts are counter-signed by a physician and checking charts for completeness; releasing information at the direction of the Medical Records Supervisor, Medical Director, or HSA; securing all active and inactive medical records; answering the telephone, taking messages, and making telephone calls; typing letters, reports, and memoranda; maintaining a roster or appointment book based on scheduled appointments for both on and off-site appointments; ordering, receiving, and maintaining office supplies; adhering to safety and security policies and participate in disaster drills; demonstrating an ability to deal with and respond to stressful situations in a stressful environment; and maintaining regular and reliable attendance.

The medical records job description set forth performance expectations for medical records clerks, including, but not limited to: performance of all clerical duties related to the assembling and maintaining of medical records; maintaining accountability for the location of any medical record on file; taking on direct responsibility to pull records and deliver for clinical use; re-filing medical records upon completion of use; pulling records and performing studies as requested by the Director of Nursing ("DON"); and completing reports and performing other duties as assigned by the HSA.

As a medical records clerk, Plaintiff was responsible for maintaining health records for the sick call, dental and mental health clinics for the entire LFCDC. She was also responsible for refilling records and organizing the files, providing assistance to staff members in locating charts in the medical records department, and updating and filing medical records charts when they were returned from the clinic.

Jonathan Bowen was Plaintiff's supervisor at the time of her re-hire. While under Bowen's supervision, the Plaintiff received generally favorable evaluations annually. She again received generally favorable evaluations when evaluated by her new supervisor Erica Burnside in March 2011. Despite having areas of concern, the Plaintiff's evaluations were generally satisfactory.

In April 2011, Patricia Tomlin became Plaintiff's new supervisor. During Tomlin's tenure, on August 2, 2011, Crystal Shadd, the Director of Comp Care, sent an email to Tomlin stating that when Dana Mullins, Case Manager with Comp Care, sought help from medical records to locate a mislabeled file, Plaintiff was rude and refused to assist her in locating the file. On August 4, 2011, Mullins emailed Tomlin to address issues with the medical records staff, including their negativity and refusal to help her locate a requested file. On August 11, 2011, Tomlin received another email from Shadd about an incident she had witnessed between a dentist and both medical records clerks, one of whom was Plaintiff. Shadd stated that she had observed the dentist ask for a specific chart and that neither Plaintiff nor her co-clerk assisted him in finding the record. Shadd noted that the dentist seemed frustrated when he did not receive assistance. On August 16, 2011, Nicole Marinaro, a Corizon phlebotomist, emailed Tomlin regarding ongoing issues with Plaintiff's rudeness and unprofessional behavior when Marinaro needed assistance with locating charts.

As a result of multiple complaints, Plaintiff received verbal counseling from Tomlin on August 18, 2011. The verbal counseling was memorialized in a memorandum, which indicated that Plaintiff was "expected to treat all staff and departments with dignity and respect" and "to perform [her] job duties which

include retrieving medical records when asked, and in a friendly and helpful manner." It also indicated that Plaintiff was "expected to comply with [her] job description which [she] read and signed on 11/11/07 which clearly defines [her] role in retrieving medical records." Plaintiff denied that she had been rude and disavowed all knowledge of the conduct mentioned in the complaints.

During the verbal counseling meeting, Levin Jones, Vice President, Operations, was also present. During the meeting, Jones told Plaintiff that the verbal counseling was just a counseling to let her know what occurred and that it would be removed from her file within six months. The verbal counseling did not result in any change in Plaintiff's employment status. After that meeting, Plaintiff understood that she was responsible for retrieving medical records.

Concerned with what were, to her, anonymous complaints received by Tomlin from jail staff, Plaintiff began her own inquiry and discussed the complaints with Major Hill, who was not a Corizon employee. Almost immediately, on September 29, 2011, a memorandum related to safety and security in the jail setting was distributed to all staff which specifically forbade all Corizon staff, including Plaintiff, from leaving their assigned medical areas unless directed to do so by the HSA or the Director of Nursing ("DON"). At about the same time, a

memorandum was issued which required Plaintiff and her co-clerk to stagger their lunch breaks and other breaks to ensure that one of them would be available at all times during weekday working hours (7:00 a.m. to 3:30 p.m.) to pull charts requested by the medical staff.[1]  This requirement effectively forbade Plaintiff and the other medical records clerk, Michelle Brown, from eating lunch together on the thirty minute lunch break allotted to them. Prior to that time, Plaintiff had been able to leave her assigned area and take her lunch break without restriction.

On September 29, 2011, Shanna Meyers, a Nurse Practitioner, submitted a letter detailing interactions with both medical records clerks, including Plaintiff, concerning their inappropriate, unprofessional and rude behavior, failure to assist staff members in locating charts, and failure to follow the proper procedure for thinning medical records. Then, on October 3, 2011, Tomlin received another email from Shadd forwarding on an email from Mullins concerning an incident on

---

[1] Plaintiff admits that medical records were necessary for the health care staff or clinics to perform their care for inmates that needed medical care residing in the detention center and that Tomlin and Jones explained that they needed someone in Medical Records in the event that a medical provider needed a chart or other medical records. Plaintiff was free to schedule her lunch with other Corizon employees working outside of the medical records department.

September 26, 2011, where she described Plaintiff's poor attitude and negative tone when Plaintiff was asked for a chart.

Tomlin met with Mullins and Plaintiff in her office on October 3, 2011, and directed Plaintiff to provide a statement setting forth "her side of the story." During that meeting, Tomlin stated "this has got to stop," expressing that Plaintiff and Mullins had to work together. After Mullins and Plaintiff went back and forth, a frustrated Tomlin stated that she was "sick of this s—t" and that maybe Plaintiff needed to find another job.

The day after the meeting, on October 4, 2011, Plaintiff submitted a written statement, styled "A Complaint," as directed to the human resources department which addressed the September 26, 2011, incident and other issues. In her written statement, Plaintiff indicated that she "[felt] as though [she was] being harassed, discriminated against and some retaliation has also been implemented." She also wrote that, because it was issued immediately after she spoke with the LFCDC staff in charge of the medical unit to determine whether the jail staff had any complaints about her performance, she believed the September 2011 memorandum requiring medical staff to remain in their assigned areas was actually directed at her and her co-clerk in medical records as a form of retaliation.

Ultimately, Plaintiff was not issued disciplinary action as a result of the September 26, 2011 incident. Human Resources Specialist Stephanie Good and Jones counseled Tomlin for using profanity in her meeting with Mullins and Plaintiff. Tomlin also complied with a directive from the human resource department to revise the memorandum concerning staff movement in the facility in order to clarify the reason for issuing the directive.

Then, on December 8, 2011, Plaintiff filed a Charge with the Equal Employment Opportunity Commission (EEOC) and amended that Charge on January 26, 2012, alleging race discrimination, harassment, and retaliation.[2] Specifically, Plaintiff alleged that:

> In August 15, 2011 [sic], I was written up by manager Trish Tomlin. I was told that my co-workers had complained about me being rude and disrespectful. In September 29, 2011, we all received a letter stating that no Corizon employee is allowed to leave their assigned area or assigned job duties unless you have been directed to do so by the HAS/DON [sic]. I feel this letter was sent directly to me. On October 3, 2011, I sent in a formal complaint about racial discrimination to human resources. This was after my co-worker Donna Mullins [sic] (White) made a complaint about me. I believe that my manager was biased during the investigation since she told me in front of my co-worker that she was sick of this shit and maybe I should find me another job. I also believe I am being retaliated against

[2] The EEOC dismissed Plaintiff's Charge and issued her a Right to Sue Notice on June 25, 2012. She commenced this action on September 21, 2012.

because I feel harassed and no one had
responded to my complaint.

Time passed, and Plaintiff received a merit pay increase on
February 19, 2012. Then, on March 27, 2012, Kristin Malone
("Malone"), Director of Nursing, went to the medical records
department to request, for use by Malone and Tomlin, two copies
of an individual's chart to complete an internal reporting
process. Plaintiff stated that she and her co-clerk could not
make such copies without having a release, and Malone left to
consult with Tomlin. Both Malone and Tomlin returned to the
medical records department, and Tomlin informed Plaintiff and
her co-clerk that they did not need such a release and that, as
medical records clerks, their job was to complete the request
immediately. Tomlin reminded both Plaintiff and her co-clerk
that making these copies was "a direct request from their direct
supervisor and was included in their job description." Tomlin
and Malone believed Plaintiff and her co-clerk were
"argumentative" when responding to Tomlin's request and "made no
move to start retrieving the chart" until Tomlin stated that "if
there was a problem with them completing this request from their
direct supervisor that they could clock out and go home."

As a result of the incident on March 27, 2012, Plaintiff
received a written counseling from Jones and Tomlin on March 29,
2012, for insubordination. The written counseling noted that

Plaintiff was "expected to comply with direct orders from [her] direct supervisor as well as medical providers and the director of nursing." During this same meeting, Jones and Tomlin provided Plaintiff with further written clarification of her job duties. The document was provided to Plaintiff in an effort to clarify and reiterate her job responsibilities and duties as, in their opinion, she appeared to not understand her duties and performance expectations. The intent was to set out Plaintiff's specific job duties and performance expectations in clear and plain terms as to prevent further misunderstanding by Plaintiff. Plaintiff admits that she was told to read the document and become familiar with it because she was expected to do all duties listed or face further action, to include termination. Notes on the document indicate that she declined to read or sign it.

Meanwhile, in March 2012, Corizon was negotiating renewal of its contact with the LFCDC. Corizon's contract with LFCDC provides budgeting for a set number of hours for medical records clerk staff. Upon review of the contract staffing agreement in conjunction with the current operating budget in late March 2012, Corizon realized that the part-time medical records clerk was working four more hours per week than allowed by the contract. To comply with the contract requirements, Plaintiff's hours were reduced from thirty (30) to twenty-six (26). This

change was communicated to Plaintiff, and she was instructed to meet with Tomlin to discuss her schedule. When Plaintiff failed to meet with Tomlin as instructed, on April 17, 2012, Tomlin sent her a letter indicating that she scheduled Plaintiff to work on the days that Plaintiff had been working, but with hours adjusted from thirty (30) to twenty-six (26), and attached the schedule for May, 2012.

On October 24, 2012, Malone received a written complaint concerning a backlog of ROIs in the medical records department. Good and Malone spoke with Plaintiff about the complaint that day and asked about the backlog of ROIs and Medical Administration Records ("MAR"). Plaintiff responded, in a handwritten statement, that the MARs were not included in her job description, dated March 29, 2012, and that extra duties listed in that job description caused her and her co-clerk to get behind on the MARs.

Gary Blair became the new HSA for the LFCDC on October 29, 2012. Blair provided Plaintiff with a new job description and a Development Plan to assist her in performing the duties set forth in the new job description on November 16, 2012. The plan emphasized the need to reduce the back-log of MARs, organize ROIs, and improve communications with medical staff. Following two additional meetings with Plaintiff to discuss her progress with the Development Plan, Blair submitted a written

recommendation that Plaintiff be terminated. Plaintiff was terminated on December 12, 2012, for the reasons set forth in Blair's recommendation for termination: failure to provide an explanation as to why she had not made more progress with respect to reducing the back-log of MARs; failure to offer suggestions of ways in which she could be assisted in performing the job duty of filing of MARs; a disrespectful, unprofessional, and insubordinate attitude to her supervisor; displays of inappropriate conduct that "severely affect[ed] the morale and productive of others;" a failure to perform an essential function of her job in keeping with the Corizon Employee Success Guide; and a failure to improve her attitude, behavior, and job performance "despite repeated opportunities."

## II.

Fed. R. Civ. P. 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party can prove the absence of a genuine issue of material fact by showing that there is a lack of evidence to

support the nonmoving party's case. *Id.* at 325. A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Further, the non-moving party may not rest upon mere allegations or denials in the pleadings but must introduce affidavits or other evidence setting "forth specific facts showing a genuine issue for trial." *Ford v. General Motors Corp.*, 305 F.3d 545, 552 (6th Cir. 2002) (quoting Fed. R. Civ. P. 56(e)).

### III.

In her Complaint, Plaintiff avers that she was a victim of disparate treatment by her former supervisor, Tomlin, because of her race and a victim of retaliation after she filed a complaint concerning her treatment with Corizon's Human Resources Department and the EEOC.  Thus, she avers that Corizon discriminated against her in the terms and conditions of her employment because of her race and engaged in conduct that was

discriminatory and retaliatory, all in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Kentucky Civil Rights Act ("KCRA"), KRS 344, *et seq.* In its Motion for Summary Judgment, Defendant argues that each of Plaintiff's claims fail as a matter of law. For the reasons set forth below, the Court agrees.

Because Samuels does not present direct evidence of discrimination, her claims under these statutes are analyzed under the three-step burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003); *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 495–96 (Ky. 2005) (applying McDonnell Douglas to KCRA age-discrimination claim); *Brooks v. Lexington-Fayette Urban Cnty. Housing Auth.,* 132 S.W.3d 790, 797 (Ky. 2004) (applying *McDonnell Douglas* to KCRA race-discrimination claim). To establish a claim of discrimination, harassment, retaliation under the KCRA, Plaintiff must prove the same elements as under Title VII. *See Jones v. Kroger, Inc.*, Civil Action No. 5:04-543-JMH, 2005 WL 2807194, *3 (E.D. Ky. Oct. 27, 2005) (citing *Brooks*, 132 S.W.3d at 803; *Tiller v. Univ. of Ky.*, 55 S.W.3d 846, 848 (Ky. Ct. App. 2001)) ("Because the purposes of the [KCRA] are similar to those in the federal act, Kentucky courts look to the federal act when construing the state act."); *see also Talley v. Bravo Pitino*

*Restaurant*, 61 F.3d 1241, 1250 (6th Cir. 1995) (overruled on other grounds by *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167 (2009)); *Mills v. Gibson Greetings, Inc.,* 872 F. Supp. 366, 371 (E.D. Ky. 1994). The Court considers Plaintiff's claims for discrimination based on disparate treatment and retaliation separately and concludes that her claims fail for the reasons set forth below.

### A. Disparate Treatment

Samuels claims that, because she is African-American, she was treated differently than white employees of Corizon and that she was subjected to discipline in a discriminatory fashion as a result of her race. For her claim to succeed, Samuels must establish a prima facie case of employment discrimination by showing that: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for [her] job; (3) [s]he suffered an adverse employment decision; and (4) [s]he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008); *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

If Samuels can establish a prima facie claim of discrimination, then "the defendant must 'articulate some legitimate, nondiscriminatory reason' for the [adverse employment action]." *Blizzard v. Marion Tech. Coll.*, 698 F.3d

275, 283 (6th Cir. 2012) (*quoting McDonnell Douglas Corp.*, 411
U.S. at 802). "If the defendant meets this burden [of
production], then [under the last step] the burden of production
shifts back to the plaintiff to demonstrate that the proffered
reason is a pretext." *Id.* (internal quotation marks omitted).
Upon a motion for summary judgment, Plaintiff must show, by a
preponderance of the evidence, that Defendant's proffered reason
was a pretext for racial discrimination. *Braithwaite*, 258 F.3d
at 493.

The Court concludes that Plaintiff, even though she is a
member of a protected class by virtue of her race, has
identified no evidence that could establish that she was treated
differently than a similarly situated employee who was not a
member of that protected class. To be characterized as
similarly-situated, the employees with whom Plaintiff seeks to
compare herself "must have dealt with the same supervisor, have
been subject to the same standards and have engaged in the same
conduct without such differentiating or mitigating circumstances
that would distinguish their conduct or the employer's treatment
of them for it." *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583
(6th Cir. 1992) (citations omitted). "In the disciplinary
context . . . to be found similarly situated," Plaintiff must
show that she and "[her] proposed comparator must have engaged
in acts of *comparable* seriousness." *Saulsberry v. Federal*

*Express Corp.*, 552 Fed. App'x 424, 430 (6th Cir. 2014) (quoting *Wright v. Murrary Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006)) (internal quotation marks omitted; emphasis in original).

In the course of discovery, Plaintiff stated that "all white nurses and administrative assistants were treated better than Plaintiff." These purported comparators have different positions and undoubtedly different job expectations. Plaintiff fails to provide any evidence of particular conduct in which they engaged or how it was similar to Plaintiff's conduct which resulted in the discipline of which she now complains. Plaintiff's subjective belief that she was treated differently than others is not enough to support a prima facie case with respect to her disparate discipline claim. *See e.g., Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 171 (6th Cir. 1996) (affirming summary judgment where the plaintiff's evidence contained numerous allegations of disparate treatment "that [were] made in general, conclusory terms, but names, times and occasions [were] missing" and where affidavits were "filled with statements of the subjective beliefs of the affiants" that the defendant discriminated against its employees from Africa); *see also Wade v. Knoxvile Utilities Bd.,* 259 F.3d 452, 463 (6th Cir. 2001); *Doren v. Battle Creek Health Sys.*, 187 F.3d 595, 598-99 (6th Cir. 1999). Moreover, Plaintiff has not presented any credible evidence that a similarly situated medical records

clerk outside of her protected class engaged in comparable conduct and was not counseled or warned.[3] Because Plaintiff can offer no legitimate comparison that will present a genuine issue of material fact, her claim of disparate treatment fails.

**B. Retaliation**

Next, the Court considers whether Plaintiff can maintain a claim of retaliation for reporting alleged discriminatory actions. To do so, the evidence must demonstrate (1) that she engaged in a protected activity, (2) that Corizon was aware of the protected activity, (3) that Corizon took a material adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action. *Ladd v. Grank Trunk Western R.R.,* 552 F.3d 495, 502 (6th Cir. 2009) (citing *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 623 (6th Cir. 2008).

If Samuels sets out a prima facie case, the burden of production shifts to Corizon to offer a non-discriminatory reason for the adverse employment action. *Id*. (citing Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007). Then, if Corizon carries its burden, the burden of production shifts back to Samuels to demonstrate that the proffered reason was mere

---

[3] Further, in Plaintiff's Response, she argues only that Defendant violated the law by retaliating against her. Thus, the Court concludes that she has abandoned or waived any argument in support of her claims of discrimination on other grounds.

pretext. *Id.* In order to establish that Corizon's stated non-discriminatory reason for terminating Samuels' employment was pretext, Samuels must produce evidence "that either the proffered reason (1) had no basis in fact, (2) did not actually motivate the adverse employment action, or (3) was insufficient to warrant the adverse action." *Id.* (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). "The burden of persuasion remains with [Samuels] throughout, even [though] the burden of production shifts back and forth between the parties." *Id.*

Ultimately, Plaintiff has failed to bear her burden of production or persuasion in establishing that Defendant's business justifications for any adverse employment actions taken after she engaged in arguably protected activity were pretextual. Even if the Court were to accept that (1) the written counseling that she received in March 2012, the reduction in the number of hours on her work schedule in May 2012, the implementation of a development plan and scrutiny with respect to her performance under that plan in November 2012, and her termination in December 2012 were (2) adverse employment actions with (3) a causal connection to her complaints of discrimination to Corizon's human resources department in her letter of October 2011 and the EEOC complaint filed in December 2011 (4) of which Defendant was aware, Plaintiff has not brought

forth evidence to demonstrate that Corizon's stated legitimate, non-discriminatory reasons for these actions were pretextual.[4]

Corizon has produced evidence that Plaintiff directly disregarded instructions from her supervisors, resulting in the written counseling for insubordination; that a clarification of its contract for services with the detention center prompted a reduction of hours for her part-time position; that a back-log of work prompted the implementation of the development plan, which she concedes was reasonable; and that her failure to meet goals set forth in that plan were the reason for the termination of her employment. In response to the Motion for Summary Judgment, Plaintiff argues that Corizon's "reason for reducing [her] hours after her complaint is also suspect;" that, in fact, her employment was terminated because of "the subjective complaints from white staff members;" and that Corizon's "articulated reason is unworthy of belief." Plaintiff offers nothing more than speculation and subjective belief to support her assertion that any of these non-discriminatory reasons were suspect, and that is not enough to place the issue of pretext before a jury because there is no material question of fact. *See McKinley v. Skyline Chili, Inc.*, 534 F. App'x 461 (6th Cir.

---

[4] Because retaliatory actions must take place in response to a protected activity, the Court has not considered any activity that might be considered an adverse employment action which took place prior to October 2011, when Plaintiff sent her letter of complaint to Corizon's human resources department.

2013) (affirming summary judgment as EEOC's speculation that employer's reliance on performance problems was "plainly suspect" fell short of demonstrating pretext). Rather, her claims fail as a matter of law.

C. **Conclusion**

For all of the reasons set forth above, Plaintiffs' claims of discrimination fail as a matter of law and shall be dismissed.

Accordingly, **IT IS ORDERED** that Defendant's Motion for Summary Judgment [DE 19] is **GRANTED.**

This the 3rd day of June, 2014.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge